Our last case of the morning, Sigmapharm v. Mutual, et al. Good morning, Your Honors. James Dabney, Fried Frank, New York, New York, representing the plaintiff appellant, Sigmapharm Inc. I'd like to reserve five minutes for rebuttal. All right. We may hold you to your ten minutes if you've reserved five. Nine years ago, two companies jointly set out to develop a pharmaceutical product that would be bioequivalent to a branded drug called Skelex. Well, there was a contract. Yes. And you've got what looks like a pretty good contract claim. If you take the defendants at their word, the plaintiff has no contract claim at all. If you take the defendants at their word, the only possibility that the plaintiff has to recover anything for the loss of its profit participation interest is under antitrust law. Profit participation interest. Yes, exactly. That's exactly what it is. This product was developed under written agreements that prescribed that the two co-developing parties, Sigmapharm and Mutual, each had specific legal and economic rights if an effort yielded what the contracts called an innovation. On this thing, isn't there a gateway provision that you have to be a competitor or a consumer to make the kind of antitrust standing claims that you're making? Your Honor, the Supreme Court and this Court has over and over again expressly held that there is no bright-line test that excludes from recovery anybody who doesn't meet one or the other of those two labels. The standard is, is the injury one that was caused by an anti-competitive or competition-reducing effect of the challenge agreement. That's the Brunswick test. The second test is the injury direct or proximate. Both of those tests are easily satisfied on the face of this complaint. How about Barton Patino's? Barton Patino's is a vertical distribution restraint case that could not be more factually distinguishable from this case. What we have here is an agreement that resulted in Mutual receiving, from what they say publicly, $300 million. And they say that they never agreed not to sell. What they did was they took money from King, being a share of King's Glaxon revenue, so that it was more profitable for Mutual not to sell than to go into honest competition. Now Mutual denies that they got anything. But how did the, if you're saying that's in restraint of trade. Yes. You had to then have competitive injury. So this had to have an anti-competitive impact on you, such that maybe you had to pay more for something because they were the restraining trade. How does the fact that because you were kind of left at the altar and didn't get royalties because they went another route, if you will, how is that an anti-competitive injury and effect and injury? There is no effect more anti-competitive in antitrust law than an agreement that results in the artificial restriction of the output of a product. But that's not what you're claiming. You're not claiming that the artificial restriction of the output damaged you. You're claiming that because they did what they did, you didn't get royalties under your contract. Quite the contrary, Your Honor.  You're not claiming royalties? That is, the royalties that Sigma Pharm was entitled to were 10% of the profits made using an innovation. 10% of the profits made if the product was manufactured. So in other words, if King made payments to Mutual, that you're entitled to a portion of those? No. The claim, the antitrust claim in this case, is that there would have been profits made on sales by Mutual of the product. Let me go back to 4C of the development agreement. Let's assume for the moment that Mutual didn't breach that. Wouldn't Sigma Pharm stand to profit from King's payments to Mutual? Absolutely not. Mutual contends that the monies it received were all received for the grant of rights to make use of certain information in a patent application. And therefore, there was no agreement not to sell, and there was no contractual breach at all. Wait a minute, just so I understand. If King pays money to Mutual, I thought Sigma Pharm would have a claim under 4C of its development agreement with Mutual that it gets a portion of those payments. Only if, after a trial, a jury were to conclude that the written agreement that King and Mutual entered into was a sham. The agreement that Mutual and King entered into purported to say that all the money that Mutual got was all just consideration for rights under a pending patent application for Mutual. So Mutual in this court denies that it ever agreed not to sell. While Mutual feels, they assert, that they avoided both regulatory scrutiny, antitrust liability, and Sigma Pharm's contract by characterizing the payments as licensed royalties to them. What is Sigma Pharm here, then? Is it a competitor, a consumer, a supplier? What is it? Sigma Pharm is a co-owner of economic rights in the product that was restrained. The agreements under which this product was developed specify that if an effort... Wait a minute, the co-owner, I thought it came up with innovations, and I thought the contract said that Mutual was the owner. If you read the agreements, it says, first of all, if an effort yields an innovation, a technological innovation... Correct. ...then certain legal and economic risks vest in both parties. With regard to markets outside the United States, Sigma Pharm gets everything. It gets the right to make... But Mutual has the option of proceeding, of deciding whether it wants to pick up on that innovation or not. Does it not? That's correct. And in the United States... So that's the choice. And Sigma Pharm executed that option. But in the United States, the contract provided that profits made using the innovation in the United States were to be split. Yes. If Mutual decided to go with that innovation. Well, Mutual is alleged to have decided to go with the innovation. Indeed, it took the innovation. It applied for a patent on the innovation, and it triggered the economic rights of Sigma Pharm. And the problem here is that having taken legal title to the innovation, subject to Sigma Pharm's rights, the allegation is that because of a corrupt, illegal, horizontal agreement with King, Mutual did not sell. And the result was that Mutual took the innovation, did not sell it, did not exploit it, and the result was that Sigma Pharm wound up with nothing. Now, there can't be a more direct result of an antitrust violation than what we allege here. But for the agreement, we say there would have been profits. The allegation in here, there were no profits. Why? Because the challenged agreement made it more profitable for Mutual to sit back and take its share of King's revenues than to enter into competition. Let me go back to... Yes. Can you direct me to a point in the development agreement where it says that, with respect to innovations that are accepted by Mutual, you are a, quote, co-owner, close quote? Because I really did understand differently. The, on the, in our complaint, paragraph 70... I'm talking about the development agreement itself. In the development agreement that's in the record, it's section, I believe it is section 4... I think your co-counsel has it. I was looking at it. I was mainly... I think your co-counsel may have it. Or you could tell us on our file. Yes. On pages 122 of the record, it basically provides that outside the United States, Sigma Farm owns everything, and inside the United States, Mutual holds title subject to the obligation to share profits in specified percentages. Okay. That's what I understood. The lost profits claim here is one that is different from any case that the other side has cited. Sigma Farm does not say, I woulda, coulda, shoulda sold something to Mutual but for the agreement. Sigma Farm says, I was entitled to receive profits on the restrained product itself, and I lost those profits because of a corrupt illegal agreement between my treacherous former co-venturer and King. I'll save the rest of my time for rebuttal. Thank you. Thank you. Thank you. Thank you, Your Honors. William O'Reilly on behalf of Appalese. Courts consistently and routinely dismiss antitrust claims by plaintiffs like Sigma Farm who are neither consumers nor competitors in the allegedly restrained market. What's the status, by the way, of the contract action? The breach of contract action. It was dismissed. The entire complaint was dismissed by the district court. The court did not choose to exercise supplemental jurisdiction. Exactly. Yeah, correct. Okay. Has it been pursued elsewhere? Has it been pursued elsewhere? State court? Not to my knowledge, Your Honor. Okay. This court has consistently and routinely dismissed such claims in cases like Barton and Patino's and the Schuylkill Energy Resources versus Pennsylvania Power and Light case, as well as other cases that we've cited in our papers. The reason for those dismissals is because such plaintiffs have not suffered antitrust injury. And the reason why those plaintiffs have not suffered antitrust injury is because under the standard articulated in Brunswick, they need to establish both that their injury was the type of injury that the antitrust laws are intended to prevent and that the injury flows from the anti-competitive aspects of the agreement. Well, on the latter, how could there, you know, we said normally, well, be a consumer or a competitor. How could there be any competitors in this restrained market? One of the allegations in the complaint, Your Honor, is that the part of the restraint, part of the aim of the restraint, was to make it more difficult for others to be able to sell generic equivalents to Sklaxin, to the King branded product. There aren't really a lot of facts in the complaint to back that up, but that is an allegation in the complaint, that somehow there was market exclusion of these other potential competitors. But, I mean, on the face of it, you enter into an agreement, a development agreement, with Sigma Pharm for innovations relating to generic drugs. And then you, in effect, abandon that because of a subsequent deal you enter into with King, and there's got to be some sort of remedy for Sigma Pharm, and they're claiming that what was done here was anti-competitive. Now, maybe it's primarily contractual. I'm not sure, but one could make an argument that it is anti-competitive, couldn't it? Could one not? One could make an argument that under the allegations in the complaint, an output restriction agreed to by horizontal competitors could, in some sense, be anti-competitive. That's not the issue here. And the allegations in the complaint establish that what Sigma Pharm is suing for is an agreement by Mutual not to sell its generic Metaxalon product. Under paragraph 4C of the development agreement, as you were discussing earlier with Sigma Pharm counsel, that provision entitles Sigma Pharm to be paid in the event of such an agreement. So the idea is that the agreement not to sell should have been with it rather than with King? I'm sorry, Your Honor, I don't… The agreement not to sell, or the agreement regarding this product, should have been with it, Sigma Pharm, rather than with King. I mean, that's their contention. No, their contention is that if Mutual is able to… Let's look at the development agreement. It has several different ways in which Sigma Pharm might be compensated if Mutual is able to successfully derive some value from the generic product. One of them is sales. One of them is licensing. One of them is selling the rights to the product. And one of them is agreeing not to sell the product. What's contemplated by the contract is that if Mutual is able to do any one of those things and derive some value from an innovation, then Sigma Pharm gets a share. And the more restrictive the products are, the more money. In other words, there is restraint within that very agreement, is there not? The amount goes up if they sell only a few. That's my point, is there's restrictions even within the agreement to Sigma Pharm. It is better for Sigma Pharm if Mutual is the only seller in the market. It's not better for Mutual, for example, if other competitors enter, if other generics enter. That is right. The reason why courts have limited antitrust injury to competitors and consumers is because the central interest of the antitrust law is in protecting the economic interests of market participants. And that's why this court in the West Penn Allegheny Health System case, for example, said that a supplier who complains about a downstream, a restriction in a downstream market, has not suffered antitrust injury because its injury is, as the court concluded, merely a byproduct of the allegedly anti-competitive restraint. It seems to me by the very nature of royalties, the minute you say royalties, it seems like there's already a different level in play. You're not a competitor. If somebody's playing somebody else's royalties, that's not the kind of thing that happens in the same marketplace, the same playing field, if you will. I agree 100%, Your Honor, and I would also point back to the language of the development agreement itself, which explicitly says at paragraph 3 of the development agreement, which is at page A122 of the record, explicitly states that mutual is the sole and exclusive owner of all right, title, and interest in and to the allegedly restrained product. In the United States. In the United States, which is where the alleged restraint occurred. So. The concept of limiting these types of actions to consumers and competitors are because they're the ones most likely to suffer harm from an antitrust violation. But why can't others suffer antitrust injury as well? The reason for limiting the scope of the remedy to consumers and competitors is because they are the ones who will suffer antitrust injury. Those who are outside of the market are unlikely to suffer antitrust injury because the injury they suffer is not the type of injury that the antitrust laws were intended to prevent. The antitrust laws were intended, again, intended to protect the interests of competitors and consumers of market participants in economic freedom. And so the types of injuries sought to be prevented are the injuries that reflect in some way some limitations on the economic freedoms of those consumers or competitors. Consumers wouldn't have access to product or would have to pay more for product or something along those lines. Yes, or a competitor might be foreclosed from a market, for example. Sigma Farm here was not foreclosed in any way from competing in whatever market or markets it competes in. Again, it was similar to the supplier. Could it have taken the innovation somewhere else? It could not have taken this innovation anywhere else because it belongs to Mutual. As this Court held in the... So you enter into a development agreement with Sigma Farm and then you enter into another agreement with Mutual. I mean, but the two appear to be seemingly on a face, you know, opposite each other. One, you're going to work with somebody to do something and the second is they're going to pay you not to have anything that's going to be generically equivalent to skelaxin, in effect. I mean, there has to be a remedy. Your Honor, a couple of points on that. First is that an agreement by a generic company not to sell an infringing product is not anti-competitive and is not unlawful. If you came up with innovations, it would be an infringing product? In this case, the product was an infringing product and that's why Mutual and King were engaged in patent litigation in the Eastern District of Pennsylvania. The generic product infringed patents that were held by King. And in order to... I understand what you're saying because the argument to them is how can they profit from, in effect, entering into an agreement that would possibly cause an infringement of the antitrust laws. But... I'm sorry. It's almost like, in the vernacular, couldn't somebody say that you're in the middle and you got bought off? No, I don't believe so, Your Honor, because, again, an agreement by a generic not to sell can be completely competitive not in any way or not anti-competitive. I didn't mean it pejoratively. I just... you got... Well, and according to Sigma Farm, if Mutual was bought off for an agreement not to sell its generic, it's entitled to contract damages. And that's an interesting point for two reasons, an important point for two reasons. One is, I think it addresses Your Honor's concern that perhaps there may not be a remedy here, but I think more importantly it establishes that any injury here to Sigma Farm arose not from the conduct itself but from the fact that it was not paid for what it believes is its share of that conduct. And that negates any causation at all for the injury that it says it suffered. At the time the agreement was allegedly entered into, according to Sigma Farm, that entitled it to money under its contract. It now had a product that had... It now had helped to develop a product that belonged to Mutual that Mutual had been able to get some value for, and Sigma Farm was entitled to a piece of that. They enter into a contract with your client so that if they come up with innovations and you manufacture and sell it, they get a portion. Then there is a contract you enter into with someone else that says that you're not going to enter into or put anything out in the market that competes with Skalaxin, right? The allegation in the complaint is that Mutual will not sell the Skalaxin product that is the subject of the development agreement. I'm sorry, the Metaxalon product. And again, the contract that that development agreement itself provides that if that happens, then Sigma Farm is compensated for that agreement. Sigma Farm contemplated precisely what it is challenging here, which is that Mutual would be able to get some value for the product by agreeing not to sell it. And if, in fact, that is the case, then under the terms of the development agreement, paragraph 4C, then Sigma Farm is not injured at all by that conduct. They may be injured if, as they say, they were never paid what they were entitled to receive under that contract. I assume the statute hasn't run for a contract action yet, has it? I don't know, Your Honor. I mean, the case that was pending and is now on appeal, I don't know the answer off the top of my head. We have nothing further unless you would like to make an additional point? I don't believe so, Your Honor. All right. Thank you. Thank you. Judge Rendell, the characterization of Sigma Farm's rights as royalties has to be looked at very carefully in this specific case. These were not your usual royalties. What Sigma Farm was entitled to was a percentage share of profits made using a potentially patentable innovation. Because you had a right under contract to those monies, correct? That's exactly right. The contracts specified that Sigma Farm was entitled to receive 10% of any profits made using the innovation. And have you pursued that contract claim? The claim that we have pleaded in the alternative that's been misstated here again and again and again. The antitrust injury here does not arise from Mutual's retention of bribe monies it got from King. The antitrust injury claimed here is lost profits that were never made because it was made more economically worthwhile for Mutual not to sell than to sell. That is completely different and distinct injury from the contract claim. Mutual denies that it agreed not to sell. It wants the court to treat it as if it made a completely different agreement with King than it made. Its agreement with King says we, Mutual, get $35 million up front and a running share of King's royalties, period. And all we're given for that is a right under a pending patent application. That's it. If that's right, if you take them at your word, then Sigma Farm has no contract claim. They say the only thing they did was to take money for rights under a patent. They would have the court find that this was just folly on King's part. King paid $300 million for rights to use technology that turned out to have no value. But that doesn't give rise to any claim for breach of contract at Sigma Farm. They said that there was no breach of contract. They say the money was for something else. Okay. That means, as Judge Ambrose says, the only chance Sigma Farm has, the only chance of antitrust law being enforced in this market as to this product is this lawsuit. The statute of limitations on the antitrust claim has passed. This patent license was done very, very cleverly. It's an incredibly sophisticated scheme. By structuring it the way they did, they didn't have to file it with the FTC, so the government didn't know about it. It didn't settle any litigation, so the government didn't know about it. What is the status of your contract complaint? The contract claim is part of this case. But, I mean, okay, but the court didn't exercise supplemental jurisdiction over that, correct? It is part of this case, and it is our hope that we will get a reversal and the contract claim will continue to be an alternative right of action which would come into effect only if the court or a jury were to find that their contract was not what they said it was. Is the statute of limitations run on the contract claim? We would, of course, say no. We would, of course, say no because it's told based on the pendency of this case. But I cannot overstate the point that the claim for breach of contract forms a felony antitrust claim. We deny, Sigma Farm denies that it ever contemplated this potentially criminal illegal per se agreement entered into by these defendants. The provisions that Judge Roof referred to were provisions that would have come into effect if Mutual, instead of making the product itself, had licensed it to someone else. So it had agreed not to sell it because it had granted exclusive rights to someone else. And in that contingency, Sigma Farm was entitled to a different share of profits than would have happened if Mutual had manufactured itself. That's what that contract was for. But to say that because they entered into a per se illegal horizontal output limitation agreement, whose obvious target was the very product that Sigma Farm co-developed, to say that Sigma Farm has no right to recovery in those circumstances is to defy the compensation policy of antitrust. Antitrust law is supposed to compensate victims. Although per se violations under Atlantic Richfield doesn't mean, doesn't necessarily mean there's antitrust interest. I completely agree. But in this case, the per se effect was output limitation. That's why we were injured. The output wasn't made. No sales were made. No profits were made. There's direct correspondence between the anticompetitive effect, i.e. output limitation, and the loss. So there is clear liability under antitrust, and tortious injury does not get any more direct than this. Our product was suppressed, and we lost. Thank you. Thank you very much. Thank you, counsel. Cases well argued were taken under advisement. I ask the clerk to recess court.